**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**JEREMY JOHNSON**                                    **CIVIL ACTION**

**VERSUS**                                                    **NO. 14-2676**

**BURL CAIN, WARDEN**                            **SECTION: "B"(5)**

<u>**REPORT AND RECOMMENDATION**</u>

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

**Procedural History**

Petitioner, Jeremy Johnson, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    On February 6, 2003, Johnson and co-defendant, Quantrell Kelson, were indicted for second-degree murder.[1]    On June 8, 2005, a

---

[1]  State Rec., Vol. 2 of 16, Grand Jury Indictment, Orleans Parish.

jury found them both guilty of the responsive verdict of manslaughter.[2]     On June 15, 2005, the trial court sentenced Johnson to a 40-year term of imprisonment at hard labor.[3]     The State filed a multiple bill of information.[4]     On August 4, 2005, Johnson's motion for new trial, motion to quash the multiple bill and motion for reduction of sentence were denied. His original sentence was vacated.     The trial court sentenced him as a second-felony offender to a 50-year term of imprisonment at hard labor.     His motion to reconsider the enhanced sentence was denied.[5]

Johnson and his co-defendant were both granted direct appeals, but due to Hurricane Katrina, all relevant transcripts of the proceedings were unavailable.     With no meaningful appellate review of their convictions possible, the court of appeal vacated both manslaughter convictions and sentences and remanded the case to the trial court for further proceedings.[6]

On December 21, 2007, the State filed a substitute bill of information charging Johnson and his co-defendant with manslaughter.[7]     In January 2008, Kelson moved to

---

[2]   State Rec., Vol. 1 of 16, Minute Entry, 6/8/05.

[3]   State Rec., Vol. 1 of 16, Minute Entry, 6/15/05.

[4]   State Rec., Vol. 2 of 16, Multiple Offender Bill of Information.

[5]   State Rec., Vol. 1 of 16, Minute Entry, 8/4/05.     Kelson likewise was adjudicated as a second-felony offender and received a 45-year sentence.

[6]   *State v. Kelson*, 06-0477 (La. App. 4th Cir. 7/26/06), 936 So.2d 321.

[7]   State Rec., Vol. 1 of 16, Minute Entry, 12/21/07.

sever the defendants.    The trial court granted the motion over the State's objection.[8]    On December 15, 2008, a jury found Johnson guilty of manslaughter.    On December 22, 2008, the trial court sentenced him to 40 years' imprisonment at hard labor without benefit of probation, parole or suspension of sentence.[9]    He was subsequently adjudicated as a second-felony offender.    The trial court vacated the original sentence and imposed an enhanced sentence of 80 years' imprisonment at hard labor.[10]    The defense objected to the excessiveness of the sentence.    Johnson appealed.

On direct appeal, he asserted the following four assignments of error:    (1) the trial court erred in denying his repeated objections regarding the conflict of interest presented by his defense counsel, which prevented him from having a fair trial; (2) the trial court erred in denying his two motions for mistrial when jury prejudice made it impossible for him to receive a fair trial; (3) the trial court erred in denying his motion to suppress the identification; and (4) his sentence was constitutionally excessive, a harsher sentence was vindictively imposed upon retrial, and the trial court erred in adjudicating him a second-felony offender.    On May 26, 2010, the Louisiana Fourth Circuit Court of Appeal affirmed

---

[8]    State Rec., Vol. 1 of 16, Minute Entry, 1/18/08.    The State's related writ application was subsequently denied by the Louisiana Fourth Circuit Court of Appeal. State Rec., Vol. 14 of 16, *State v. Kelson*, 2008-K-0130 (La. App. 4th Cir. Apr. 3, 2008).    The Louisiana Supreme Court similarly denied relief.    State Rec., Vol. 15 of 16, *State v. Kelson*, 2008-KK-0947 (La. 2008).

[9]    State Rec., Vol. 13 of 16, Transcript of Sentencing (Dec. 22, 2008), p. 7.

[10]    *Id*. at 20.

his conviction and sentence.[11]    He did not file an application for writ of certiorari with the Louisiana Supreme Court.

On May 13, 2011, his retained attorney C. Gary Wainwright submitted an application for post-conviction relief to the state district court on Johnson's behalf. [12]    In that application, he asserted the following claims:    (1) the evidence was insufficient to support his conviction for manslaughter; (2) the 80-year sentence was unconstitutionally excessive and harsher than the sentence originally imposed; and (3) he was denied the right to effective assistance of counsel due to a conflict of interest.    On June 28, 2012, while the application was pending, Wainwright was suspended from the practice of law for 18 months. On March 25, 2013, the district court denied relief.    The district court reasoned:

> The Fourth Circuit denied each of the Petitioner's claims for relief, which are the exact claims now being raised by Petitioner in the instant Application for Post-Conviction Relief [and] pursuant to La. C.Cr.P. art. 930.4, any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered.[13]

Martin Regan, Jr. enrolled as counsel of record for Johnson and filed a notice of intent to seek writs from the March 2013 ruling denying post-conviction relief.    The district court set a return date of April 25, 2013.    Meanwhile, on April 18, 2013, counsel filed a "Motion

---

[11]    *State v. Johnson*, 2009-KA-0706 (La. App. 4th Cir. 5/26/10), 41 So.3d 1188; State Rec., Vol. 13 of 16.

[12]    State Rec., Vol. 9 of 16, Application for Post-Conviction Relief, 5/13/11.

[13]    State Rec., Vol. 9 of 16, District Court Ruling denying PCR, 3/25/13.

to File Memorandum in Support of Claimed Basis for Relief," in which he requested 30 days to file a supplemental memorandum "amplifying the facts underpinning the legal basis upon which Mr. Johnson seeks post-conviction relief."     On May 15, 2013, counsel filed a supplemental memorandum to amend the post-conviction application to include five additional claims:     (1) the trial court failed to instruct the jury as requested on the responsive verdict of negligent homicide; (2) the trial court erroneously denied him the ability to confront and cross-examine the State's sole eyewitness with her conflicting and inconsistent grand jury testimony; (3) the State knowingly presented false testimony (*Napue*); (4) ineffective assistance of trial counsel for failing to introduce expert testimony regarding his mental health during the suppression hearing; and (5) ineffective assistance of appellate counsel for failing to raise issues on direct appeal with respect to claims one through three.[14]     He was also granted two more extensions of time, until June 24, 2013, in which to file his application for writs to the Louisiana Fourth Circuit Court of Appeal.     On June 24, 2013, the district court issued a ruling denying his proposed amendments to the post-conviction relief application, which had been denied in March.[15]

He timely filed his related writ application challenging the March 2013 ruling with

---

[14]     State Rec., Vol. 9 of 16, Wainwright Affidavit attached to Motion to Amend PCR. His affidavit further explains that on July 1, 2012, he began working as a paralegal for Martin Regan, Jr., who directed him to review the post-conviction applications he had previously filed that were still pending.

[15]     State Rec., Vol. 8 of 16, District Court Ruling, 6/24/13.

the Louisiana Fourth Circuit Court of Appeal.    He later submitted a copy of the district

court's June 24, 2013 ruling denying his amended and supplemental claims.    On October

14, 2013, the Louisiana Fourth Circuit Court of Appeal denied relief, stating:

> Relator seeks review of the trial court's March 25, 2013 denial of his
> application for post-conviction relief. Finding no error in the trial court's
> ruling, the writ application is denied.[16]

Johnson filed a counseled supervisory writ application with the Louisiana Supreme Court.[17]

On October 10, 2014, the Louisiana Supreme Court denied relief without citing additional

reasons.[18]

During the time these writ applications were pending, Johnson continued to pursue

relief in the state district court.    On August 2, 2013, Regan filed a second counseled post-

conviction application with the state district court.[19]    This application included the same

five claims the district court had rejected when he belatedly tried to expand the scope of the

first application for post-conviction relief.    In January 2015, supplemental exhibits were

filed for consideration.[20]

---

[16]  State Rec., Vol. 14 of 16, Fourth Circuit Writ Application No. 2013-K-0882; *State v. Johnson*, 2013-K-0882 (La. App. 4th Cir. Oct. 14, 2013).

[17]  State Rec., Vol. 15 of 16, Louisiana Supreme Court Writ No. 13-KP-2657.

[18]  State Rec., Vol. 15 of 16, *State v. Johnson*, 2013-KP-2657 (La. 2014), 150 So.3d 892.

[19]  State Rec., Vol. 9 of 16, Uniform Application for Post-Conviction Relief, 8/2/13.

[20]  State Rec., Vol. 8 of 16, Supplemental Exhibits for Consideration with Post-Conviction Relief Application, 1/20/15.

While that post-conviction application was pending, on November 21, 2014, counsel on his behalf filed a federal application for relief in this Court.    In that application, he raised eight claims for relief:    (1) the evidence was insufficient to support the conviction; (2) the sentence was unconstitutionally excessive and vindictive; (3) ineffective assistance of trial counsel due to a conflict of interest; (4) the trial court failed to instruct the jury on negligent homicide; (5) the trial court refused to allow the defense to use a grand jury transcript during cross-examination in violation of due process and his right to confrontation; (6) the State failed to present the conflicting version in the grand jury transcript and exploited false testimony by a state witness; (7) trial counsel was ineffective for failing to call a psychiatric witness during the suppression hearing; and (8) appellate counsel was ineffective for failing to raise several claims on direct appeal.    Johnson sought and was granted a stay of his federal proceedings based on the pending state-court application for post-conviction relief, which included additional claims for relief.[21]

On or about October 30, 2015, Wainwright was substituted as counsel of record for Regan in the state-court post-conviction proceedings.[22]    In February 2016, the district court ordered the State to file any procedural objections to the pending application for post-conviction relief.    On March 4, 2016, the State filed its procedural objections and asserted that summary dismissal was proper under Louisiana Code of Criminal Procedure articles

---

[21]   Rec. Doc. 22, Order, 4/30/15.

[22]   State Rec., Vol. 8 of 16.

930.4 and 930.8.[23]    On January 31, 2017, the district court granted the State's procedural objections and denied relief on those grounds.[24]    On April 25, 2017, his related writ application was denied without stated reasons by the Louisiana Fourth Circuit.[25]    On April 27, 2018, the Louisiana Supreme Court likewise denied relief.[26]

On May 23, 2018, Johnson moved to vacate the stay and proceed with his federal application.[27]    The motion was granted and the State was ordered to file its response.[28] On September 20, 2018, the State filed a response to the federal application.[29]    The State's response concedes that the federal application is timely, but argues that the claims are unexhausted and procedurally defaulted.

On March 14, 2019, the Court ordered the parties to submit supplemental briefing on the issue of vindictiveness of the sentence.[30]    The State filed its supplemental brief on April

---

[23]   State Rec. Vol. 9 of 16.

[24]   State Rec., Vol. 9 of 16, District Court Ruling on State's Procedural Objections to PCR Application, 1/31/17.

[25]   State Rec., Vol. 14 of 16, La. App. 4th Cir. Writ No. 2017-K-0304; *State v. Johnson*, 2017-K-0304 (La. App. 4th Cir. Apr. 25, 2017).

[26]   State Rec., Vol. 16 of 16, *State v. Johnson*, 2017-KP-0872 (La. 2018), 239 So.3d 836.

[27]   Rec. Doc. 30.

[28]   Rec. Doc. 31.

[29]   Rec. Doc. 40.

[30]   Rec. Doc. 41.

18, 2019 and Johnson filed his counseled supplemental brief on April 24, 2019.[31]

## Facts

On direct appeal, the Louisiana Fourth Circuit summarized the facts adduced at trial

as follows:

> On the night of December 5, 2002, Louis Kaplan was severely beaten in his Algier's apartment and left in a trash dumpster. Although he was still alive when the police found him, Mr. Kaplan died a few days later in the hospital. The forensic pathologist who performed the autopsy determined the cause of death to be blunt force trauma.

> On the night in question, the New Orleans Police Department ("N.O.P.D") received several 911 calls concerning this crime. Gesielle Rousell, N.O.P.D. Assistant Communications supervisor, identified an audiotape of one of the 911 calls received on December 5, 2002, from the crime scene (3800 Texas Drive in Algiers). The caller (Keisha Price) said she was sleeping at her boyfriend's apartment and woke up to find blood all over the apartment. The caller reported "two black males, no description given." The caller further reported that she jumped out of the window, that her boyfriend possibly was injured inside, and that it was unknown if the subjects were still inside. The call was documented as a report of "unknown trouble."

> N.O.P.D. Officer Richard Sasnett testified that he and his partner responded to the report of unknown trouble. In route to the scene, they were flagged down by a female (later identified as Ms. Price) about a block and a half from the apartment. Ms. Price was hysterical, hyperventilating, and having trouble communicating. After the officers calmed her down, Ms. Price described the two suspects who beat up her boyfriend, Mr. Kaplan, as two black males. The first one was six feet tall, weighing one hundred and fifty pounds, and wearing a gray hooded sweatshirt. The second one was about five feet ten inches tall, weighing one hundred and eighty pounds, and wearing all dark clothing. Ms. Price also reported that the first one (the six foot tall individual) came into the bedroom where she was sleeping and that he had a gun.

> After speaking with Ms. Price, Officer Sasnett testified that they broadcast the

---

[31] Rec. docs. 42, 43.

information they obtained from her regarding the two suspects over the police radio and relocated to the apartment. Officer Sasnett entered the apartment, and his partner stayed in the police vehicle with Ms. Price. Officer Sasnett described the apartment as a very bloody scene and characterized it as probably one of the worst crime scenes he had ever seen. Explaining the layout of the apartment complex, Officer Sasnett stated that it was part of a four-plex with two apartments downstairs and two upstairs; Mr. Kaplan's apartment was one of the upstairs apartments. There was a common entrance with stairs to the two upstairs apartments, and a foyer in between them. Officer Sasnett testified that they found a large pool of blood around the front steps of the apartment complex itself, bloody prints and splatters all the way up the common staircase leading up to Mr. Kaplan's apartment, and blood all over the front door of the apartment. He testified that "it was obvious that a big fight had taken place because the furniture had been knocked over and there was blood splattered all over the main room of the apartment."

On cross-examination, Officer Sasnett testified that the lights were on in the apartment when he arrived. He believed another unit had arrived before him and that the officers in that unit had gone to look for the victim. The victim, Mr. Kaplan, was discovered in a dumpster fifty yards away from the apartment complex.

N.O.P.D. Officer Brian Sullivan testified that his unit was the first one to respond to the report of unknown trouble. When he and his partner arrived at the apartment, the front door was open, the lights were on, but no one was inside. Large puddles of blood were on the carpet, and blood was spattered on the wall. Officer Sullivan decided to canvass the area and to attempt to locate a blood trail that would lead him to the bleeding victim. As he was exiting the apartment complex, an unidentified black male, who was standing across the street, flagged him down. Officer Sullivan characterized the man's demeanor as that of a concerned witness. The unidentified man informed him that the victim's body was in a dumpster and pointed him in the direction in which the suspects had fled.

Officer Sullivan testified that he immediately relocated to the dumpster and heard a moaning noise. He looked inside the dumpster and observed several garbage bags and a white sock that appeared to have blood on it. When he removed the garbage bags, he observed a white male, who was in very bad condition. The victim had a large laceration on his throat, was badly beaten, and was wearing only his underwear and socks. Emergency Medical Service

("EMS") and the New Orleans Fire Department arrived on the scene, flipped the dumpster on its side, and removed the victim. The victim was transported to the hospital where he died a few days later. Although Officer Sullivan returned to the spot where he had spoken to the unidentified witness ten minutes earlier, he was unable to find that witness.

N.O.P.D. Sergeant Keith Joseph, Sr., testified that he also responded to the report of unknown trouble. While he was taking a statement from Ms. Price at the crime scene, Sergeant Joseph was notified by other officers that two possible suspects had been detained. He instructed the officers to bring the suspects back to the scene so that the eyewitness, Ms. Price, could identify them. Describing the identification procedure, Sergeant Joseph testified that Ms. Price was seated in the rear of an unmarked police unit on the scene with a detective. The suspects were brought before her one-by-one and illuminated. Ms. Price identified them as the two individuals who beat up the victim, dragged him down the steps, and threw him into a dumpster. On cross-examination, Sergeant Joseph acknowledged that the suspects were in handcuffs at the time the identifications were made.

N.O.P.D. Officer Edgar Baron responded to a call of suspicious activity—two subjects dumping a body in a dumpster on Texas Street. As he was in route to the scene, he spotted two men (later identified as Mr. Johnson and Mr. Kelson) that fit the description of the suspects that was broadcasted over the police radio. One man was dressed in dark clothing; the other man was dressed in sweatpants, a gray sweatshirt, and a dark headband. Officer Baron, who was in plainclothes, stopped his unmarked police unit and identified himself as a police officer. When he had the door of his vehicle open, the two men were near the front of his vehicle. At that point, Officer Baron was able to see their faces. The two men then fled. Officer Baron caught Mr. Johnson without ever losing sight of him. As he was returning to his vehicle with Mr. Johnson in custody, Officer Baron noticed the other man running in the back of an apartment complex. He also noticed that the other man had removed a garment of clothing (his top).

The suspects were apprehended five to ten minutes after the initial broadcast of the incident and only four or five blocks away from the crime scene. Officer Baron drove Mr. Johnson back to the crime scene for an on-the-scene identification procedure. He displayed Mr. Johnson un-handcuffed outside the police car. Other officers illuminated Mr. Johnson with a spotlight. Following the identification, Officer Baron placed Mr. Johnson under arrest for

aggravated battery and transported him to the detective's division at the police station.

At the police station, Mr. Johnson requested to use the restroom. Fearing Mr. Johnson might dispose of evidence in the restroom, Officer Baron performed an extremely thorough check of him. Officer Baron noticed that Mr. Johnson had wet blood on both of his shoes and socks, and seized those items. Officer Baron refreshed his memory with his notes regarding the conversation between him and Mr. Johnson that followed; he testified:

The exact verbiage I was given was, "Please just let me go to the bathroom and clean my bloody shoes off"—excuse me, "and clean the blood off my shoes. Nobody has to know." He then advised me that the victim was a—he was a victim of the game and that he had to kill the individual known to him as Paco. He stated that "Paco was a player in the game and he tried to get out on a funny style so, I was ordered to do a hit on him by the man." He went on to tell me that he was friends with Paco and that they grew up together and attended school together as kids. He additionally advised me that he had never been convicted of any crimes due to his connections with the FBI. Johnson stated that he could have any witnesses of his crime killed by the man. Then he asked me to consider just hiding the shoes for the detectives and he would greatly reward me.

Officer Baron also testified that when Mr. Johnson was apprehended he was wearing his sweatpants turned inside out. After Mr. Johnson's clothing was taken from him at booking, his sweatpants were turned right-side out and what appeared to be blood was found on the exterior side. Once the detectives arrived and took custody of Mr. Johnson, Officer Baron left the office to check whether Mr. Kelson had the same type of substance on his clothing, which he believed to be blood. He learned that Mr. Kelson also had that same type of substance on his clothing. On cross-examination, Officer Baron testified that Mr. Johnson did not resist arrest.

Officer Baron was questioned about errors in the listing of evidence on the police property room evidence list. One error was the failure to list Mr. Johnson's shoes despite that the shoes were in the property room with other evidence in the case. A second error was the failure to list a key chain until nineteen days later; Officer Baron testified that the key chain may have been inside of a pocket where he did not notice it initially. A third error was the gray sweatshirt was listed as gray sweatpants, and a white headband was listed as

white socks. Officer Baron denied adding any evidence into the Evidence and Property Room for the case.

Former N.O.P.D. Homicide Detective Thomas Redmond testified that he worked on this case after Mr. Kaplan died. (The case was originally not a homicide case because Mr. Kaplan did not die until a few days after the crime occurred.) Detective Redmond stated that the police received three 911 calls on the night of the incident: one from Ms. Price, another from Marlene Taylor, and a third call from an unidentified caller. Ms. Taylor's call was in reference to her son having seen part of the event at the Algiers apartment. Detective Redmond testified that he spoke with Ms. Taylor and that she relayed the part of the event that she had seen. She also relayed that her son, who alerted her to what was happening, had seen "a good bit of the event." Ms. Taylor informed the police that her son had gone to Texas. Despite multiple attempts to reach Ms. Taylor's son, Detective Redmond testified that they were unable to locate him. On cross examination, Detective Redmond acknowledged that in his report he indicated that there was a possibility of a third suspect. Detective Redmond testified that some time after the incident he took a recorded statement from Ms. Price. Given the date of birth Ms. Price gave him in her statement, he calculated that Ms. Price was fourteen years old at the time she gave her statement.

Consistent with Detective Redmond's testimony, Ms. Price testified that she was fourteen or fifteen years old at the time of the killing. She testified that at the time of the incident she was staying with her boyfriend, Mr. Kaplan, in his apartment. She had been staying with him for about one or two months and was pregnant with his child. On the night of the incident she was sleeping in the bedroom of Mr. Kaplan's apartment, and he was in the living room with some friends. A man (later identified as Mr. Kelson) awoke her, told her to sit down, and grabbed her by her throat when she did not. Mr. Kelson then left the room, went into the living room, and left the bedroom door cracked open. At some point thereafter, Ms. Price went into the hallway. Ms. Price testified that she was unable to see exactly what the men were doing to Mr. Kaplan, but she was able to see that there was blood all over the room. She testified that she saw a man (later identified as Mr. Johnson) and Mr. Kelson had Mr. Kaplan pinned down on the sofa. Although the light was not on in the living room, she testified that the television was on and reflecting directly on the sofa where Mr. Kaplan was being beaten by Mr. Johnson and Mr. Kelson. Ms. Price testified that she saw Mr. Kaplan get loose at one point and start pulling on the front door knob, trying to get out. His shirt was ripped up and full of blood. She also

testified that she heard the two men tell Mr. Kaplan to take it like a man.

Ms. Price described Mr. Johnson as wearing dark hooded clothing and Mr. Kelson as a tall, brown, skinny man who was wearing dark clothing. Ms. Price stated that at one point when she was observing what was happening Mr. Johnson noticed her, and she was able to see his face. Ms. Price said that Mr. Johnson and Mr. Kelson dragged Mr. Kaplan out of the apartment. She did not know what happened after that because once they left she ran, closed the door, and escaped through a window.

After jumping out of the window, Ms. Price spotted two women walking out of another apartment; she used their phone to call the victim's mother and 911. When the police arrived, Ms. Price testified that they put her in the rear of a police car. While seated in the police car, Ms. Price viewed Mr. Johnson and Mr. Kelson. She testified that the police had a light shining on the two men. She positively identified them by their clothing and their faces.

On cross examination, Ms. Price testified that she did not recall testifying at an earlier hearing that she never left the bedroom during the time the victim was being beaten. When confronted with her testimony from an earlier hearing, when she said that she "didn't come completely out of the bedroom," Ms. Price replied that if she said it earlier it was true. Ms. Price also testified that the incident happened five years earlier and that she was unable to remember every detail, but she remembered the two men killing Mr. Kaplan. She testified that Mr. Johnson did most of the work because he was in the living room with Mr. Kaplan, and Mr. Kelson was in the bedroom with her. Ms. Price confirmed on redirect examination that she could see what was happening from where she was standing and that she never said there were more than two attackers.

At trial, Ms. Price identified photographs of Mr. Kaplan's apartment. She also positively identified Mr. Johnson as the man she saw pinning down the victim on the sofa and hitting the victim. When asked how certain she was that Mr. Johnson was one of the perpetrators, Ms. Price replied that she was a thousand percent certain.

Lucia Kaplan, the victim's mother, testified that on the night Mr. Kaplan was killed she received a call from Ms. Price. She and her husband went to the hospital that night. At the hospital, she recognized the body of her badly beaten son only by the tattoo on his arm. She knew Mr. Johnson and Mr. Kelson from the neighborhood. She testified that they used to hang around with her son.

Dr. Mary Jo Wright was stipulated to be an expert in trauma and critical care. Dr. Wright testified that she was the attending trauma call surgeon who treated Mr. Kaplan at the hospital. According to Dr. Wright, Mr. Kaplan was comatose and his drug screen was negative. He had a large slash wound on his right neck, a footprint on his chest, was barely breathing, had no diastolic blood pressure, and had lost a lot of blood. His right eye was swollen completely shut. He had a nasal fracture and eye socket fracture, and his nose had to be packed to stop the bleeding. A CAT scan of his brain revealed subdural hematomas and swelling. Dr. Wright said the head trauma was so severe that his brain essentially began to swell. Although a tube was placed to drain fluid from his brain, the swelling continued and he was pronounced dead.

N.O.P.D. Crime Scene Technician Sidney Street testified that on December 5, 2002, he was called to the crime scene. Ms. Street identified her crime scene report, a number of photographs depicting the crime scene, and articles of evidence collected at the scene and other nearby locations. Two knives were collected in the grass outside the victim's apartment building. Ms. Street testified that she was unable to lift fingerprints from either of the knives because of the items' surfaces, the way the blood was smeared, and fluids on the knives. She did not recover any fingerprints from the scene because she determined that no suitable prints could be lifted.

Former N.O.P.D. Criminalist Officer Joseph Taffaro testified that he tested clothing from Mr. Johnson and Mr. Kelson for the presence of blood. Blood was found on Mr. Johnson's green jogging pants, red T-shirt, gray boxer shorts, gray socks, and right and left gray/black Nike tennis shoes. Blood was also found on Mr. Kelson's blue jeans, FUBU sweater, and blue boxer shorts. Officer Taffaro cut samples for testing from the foregoing blood stained articles of clothing and tennis shoes.

Anne Montgomery, who was stipulated to be an expert in the field of molecular biology and forensic DNA, testified that she compared DNA found on the clothing of Mr. Kelson and Mr. Johnson to the victim's DNA. DNA samples taken from the blood on Mr. Kelson's blue jeans and his FUBU sweater were consistent with the victim's DNA. However, DNA samples taken from the blood on one of Mr. Johnson's gray/black Nike tennis shoes and on Mr. Johnson's green jogging pants were both inconclusive, due to insufficient or excessively degraded DNA. The sample on Mr. Johnson's clothing thus was unable to be

tested. Ms. Montgomery explained that heat, humidity, moisture, and mildew cause DNA to degrade. She noted that the evidence could have been improperly stored or not fully air-dried.

Dr. James Traylor was qualified by joint stipulation as an expert in the field of forensic pathology. He performed the autopsy on Mr. Kaplan's body. He described the injuries to Mr. Kaplan's head as severe. Mr. Kaplan also had multiple sharp force injuries, including sharp force defensive wounds and abrasions. Mr. Kaplan had various types of force injuries, but Dr. Traylor opined that the cause of his death was blunt force injuries, the mechanism being cerebral edema.[32]

## Preliminary Review - Procedural Default

The Court first considers the State's assertion that Johnson's habeas claims are procedurally barred from federal review because he failed to exhaust his remedies in the state courts. The State argues that as to his first three claims, Johnson failed to assert them in the state's highest court. A review of the record shows that Johnson raised two of the claims, *i.e.*, sentencing and conflict of interest, on direct appeal in the Louisiana Fourth Circuit, but then did not file an application for certiorari with the Louisiana Supreme Court. He never raised a claim of insufficient evidence as part of his direct appeal.

He then raised all three claims on collateral review in his application for post-conviction relief filed with the state district court. The state district court denied the claims, citing Louisiana Code of Criminal Procedure article 930.4 (A) ("any claim for relief which was fully litigated in an appeal from the proceedings leading to a judgment of

---

[32] *State v. Johnson*, 41 So.3d 1193-98.

conviction and sentence shall not be considered").[33]    In the counseled writ application filed with the intermediate court of appeal, the three claims were set forth as part of the statement of the case, albeit the issue raised and argued was the alleged denial of due process because the trial court denied post-conviction relief *sua sponte*, without deciding his claims on the merits, even after the court was notified that counsel had been suspended and without any inquiry regarding whether petitioner had obtained new counsel or whether his application was complete.    The appellate court found no error in the trial court's ruling and denied relief.

Johnson then filed his related writ application with the Louisiana Supreme Court. Again, the claims focused on the procedural improprieties and due process violations associated with the state courts' rulings, rather than on the merits of the underlying substantive claims (which the state district court had not decided).    The writ application did include arguments about ineffective assistance of counsel associated with the conflict of interest and the imposition of a more severe sentence after retrial, but omitted discussion

---

[33]    La. Code Crim. P. art. 930.4(A) precludes post-conviction review of claims already "fully litigated" on direct appeal.    *Bennett v. Whitley*, 41 F.3d 1581, 1583 (5th Cir. 1994). This rule presumes that the claims have been fully reviewed by the state appellate court on direct appeal and therefore need not be considered again on post-conviction application. *Id.*    However, "the bar imposed by article 930.4(A) is not a procedural bar in the traditional sense, nor is it a decision on the merits."    *Id.* The bar does not preclude federal habeas review of claims that were considered on direct appeal.    This court simply "look[s]-through" the ruling on collateral review and considers only the direct appeal proceeding. *Id.* at 1582-83.    Thus, this Court may consider the grounds for denial of relief presented by the appellate court on direct appeal review.

about the sufficiency of the evidence.    Nonetheless, the application itself clearly set forth the three claims upon which the writ application was premised and asserted that the claims raised in his post-conviction application were wrongfully summarily denied.[34]    Therefore, contrary to the State's assertion, Johnson's first three claims were properly exhausted on collateral review.

Furthermore, the Court finds no basis for a procedural bar to federal review of the first three claims for relief.    The State correctly notes that the claims were denied by the state district court under Louisiana Code of Criminal Procedure article 930.4(A), which is not itself a bar to federal habeas review.    *Bennett v. Whitley*, 41 F.3d at 1583.    The state district court mistakenly reasoned that *all three* claims were fully litigated on appeal and cited the language from that statutory provision.    The intermediate appellate court found no error in the district court's ruling.    The Louisiana Supreme Court offered no further reasons for denying relief.[35]    The Court declines to accept the State's attempt to single out the sufficiency claim as procedurally barred under Louisiana Code of Criminal Procedure article 930.4(C), for failing to pursue the claim on appeal, when the basis for the state district court's ruling was clearly Subsection (A).    Even if incorrect as to the claim of insufficient

---

[34]    State Rec., Vol. 15 of 16, Louisiana Supreme Court Writ No. 2013-KP-2657, pp. 15-19.

[35]    *See* State Rec., Vol. 9 of 16, PCR Application and District Court Order, 3/25/13; Louisiana Fourth Circuit Writ, 6/24/13 and Writ Denial No. 2013-K-0882; State Rec., Vol. 15 of 16, La. S.Ct. Writ, 11/13/13 and Writ Denial No. 2013-KP-2657.

evidence to convict (which contrary to the district court's ruling was not raised on direct appeal), this Court will not read into the ruling a different procedural basis for the state court's denial of relief under state law.

The State also argues that Johnson failed to exhaust his available state remedies for the second group of claims, Nos. 4-8, and that even if exhausted, the claims were procedurally barred by the state courts and are not subject to federal habeas review. The Court agrees with that assertion given the procedural backdrop for these claims.

Johnson first attempted to raise the claims by amending or supplementing his first application for post-conviction relief. He did so, however, only *after* the trial court had issued a ruling denying his application for post-conviction relief. In June 2013, the trial court rejected the proposed amendments filed nearly two months after the post-conviction application was denied as an improper attempt at "reconsideration," aimed at avoiding procedural limitations.[36] Johnson only filed a notice of intent to seek writs from the March 2013 denial of his post-conviction application, and he incorporated his argument related to the proposed amended claims in that writ application. He subsequently filed a copy of the district court's ruling with the appellate court in July 2013. However, the appellate court's ruling denying relief clearly encompassed only the March 2013 district court ruling from which Johnson filed his notice of intent to seek writs. The writ ruling stated, "Relator seeks

---

[36] State Rec., Vol. 8 of 16, District Court Ruling on Petitioner's Amendments to Timely Filed Post-Conviction Relief Application, 6/24/13.

review of the trial court's March 25, 2013 denial of his application for post-conviction relief. Finding no error in the trial court's ruling, the writ application is denied."    The Louisiana Supreme Court denied relief on his related writ without additional stated reasons.

In August 2013, Johnson filed a second application for post-conviction relief raising the additional claims for relief.    The state district court denied relief under Louisiana Code of Criminal Procedure articles 930.4 (repetitive and successive) and 930.8 (untimely).    In his counseled writ application to the Louisiana Fourth Circuit and the Louisiana Supreme Court, Johnson argued that the district court erred in denying his second post-conviction relief application as successive.    He did not specify the underlying substantive claims, but he did incorporate them by reference to the attached exhibits and included a brief discussion regarding the grand jury transcript and the omitted responsive verdict.    The state courts of appeal denied relief without additional stated reasons.    *See Ylst v. Nunnemaker*, 501 U.S. 797, 802, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (when the last state-court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state-court opinion).    Arguably then, the claims were properly presented and therefore exhausted.    *See*, *e.g.*, *Miller v. Quinn*, 307 F. Appx. 96, 98 (9th Cir. 2009) (finding exhaustion requirement was met when petitioner filed his petition raising the federal claims as an appendix to his motion for discretionary review).    However, even if the claims were exhausted, the State correctly argues that the claims were expressly rejected by the state

courts under Louisiana Code of Criminal Procedure articles 930.4 and 930.8, and thus are procedurally defaulted.[37]

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state-law ground that is both independent of the merits of the federal claim and adequate to support that judgment. *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997), *cert. denied*, 523 U.S. 1125 (1998); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 260, 262 (1989)). The United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision. To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims. This rule applies to state court judgments on both substantive and procedural grounds.

*Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted). The last reasoned state court ruling is used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. at 803–

---

[37] Louisiana Code of Criminal Procedure Article 930.4(E) provides that "[a] successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application." Louisiana Code of Criminal Procedure article 930.8 provides a two-year period of limitations for filing applications for post-conviction relief and that period generally runs from the date that the judgment of conviction becomes final under Louisiana law, which for Johnson was in June 2010.

05.

In the last reasoned state-court judgment, the state district court clearly and expressly rejected Johnson's claims on state-law procedural grounds, finding the claims untimely pursuant to Louisiana Code of Criminal Procedure article 930.8 and successive pursuant to Louisiana Code of Criminal Procedure article 930.4.    It is well-settled that article 930.8 qualifies as an independent and adequate state-law procedural ground to support a procedural bar to review.    *Glover v. Cain*, 128 F.3d at 902; *see also Morris v. Cain*, No. 06–30916, 2008 WL 3876479 (5th Cir. Aug. 20, 2008) (per curiam); *Pineyro v. Cain*, 73 F. Appx. 10, 11 (5th Cir. 2003).    The United States Fifth Circuit Court of Appeals has held that denial of relief premised on the untimeliness of a claim under article 930.8 "is sufficient to fulfill the independence requirement" of the procedural default doctrine, and that article 930.8 is strictly and regularly followed and evenhandedly applied by Louisiana courts to the vast majority of similar claims.    *Glover*, 128 F.3d at 902.

The state courts also found the claims barred as repetitive and successive.    The record shows that Johnson failed to raise the claims in his first application for post-conviction relief.    Johnson's counsel offered his explanation for the omission, but the district court reasoned, "Petitioner should have known of the errors complained of in this successive application.    Further, the claims were contained in the appellate record and subsequently raised untimely by petitioner's counsel."[38]    As the United States Fifth Circuit

---

[38]    State Rec., Vol. 9 of 16, District Court Order, 1/31/17.

Court of Appeal has recognized, Louisiana Code of Criminal Procedure article 930.4(E) constitutes an independent and adequate state-law procedural ground to support a procedural bar to review.   *Ardison v. Cain*, 264 F.3d 1140, 2001 WL 822445, at \*4–5 (5th Cir. 2001); *Besse v. Tanner*, Civ. Action No. 16-2992, 2017 WL 2936311, at \*8 (E.D. La. July 7, 2017); *Bell v. Baton*, Civ. Action No. 11-0304, 2012 WL 5364239, at \*3 (M.D. La. Sep. 24, 2012), *adopted*, 2012 WL 5364237, at \*1 (M.D. La. Oct. 31, 2012) (concluding that Article 930.4(E) has been found to be an adequate, independent state ground for rejecting a petition for post-conviction relief, and the federal courts have relied upon this statute in finding claims to be technically exhausted but procedurally defaulted).

Because the last reasoned state-court decision rested expressly upon an independent and adequate state rule of procedural default, this Court may not review the instant claim unless petitioner demonstrates cause for the default and actual prejudice or a fundamental miscarriage of justice.   *Glover v. Cain*, 128 F.3d at 902 (citing *Coleman*, 501 U.S. at 731–32); *Amos v. Scott*, 61 F.3d at 338–39 (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989) and *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)).   Johnson has demonstrated neither.

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.   *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).   The mere fact that a petitioner or his counsel failed to recognize the factual or legal

basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.[39]   *Id*. at 486.   The inexplicable omission by Johnson's retained post-conviction counsel in failing to recognize and raise the five claims earlier does not constitute cause.   To the extent Johnson may try to justify post-conviction counsel's oversight based on direct appellate counsel failing to raise the claims on direct appeal and making the claims harder for post-conviction counsel to spot initially, that assertion fails to demonstrate sufficient cause.   Plainly, any alleged failure on the part of appellate counsel does not absolve retained post-conviction counsel's independent duty to his client in filing a post-conviction application.

In *Martinez v. Ryan*, 566 U.S. 1, 16-18 (2012), the Supreme Court carved out a narrow exception to the procedural default rule only for claims of ineffective assistance of trial counsel when post-conviction review is the first time a petitioner can bring such claims, and petitioner had either ineffective collateral review counsel or no counsel at all.   Johnson raises one claim of ineffective assistance of trial counsel for failing to call an expert psychiatric witness during the hearing on the motion to suppress his statement.

The record includes an affidavit by state post-conviction counsel in which he states he made an "egregious error" in overlooking this claim, among others, when he filed the initial post-conviction relief application.   Even assuming state post-conviction counsel's performance was ineffective, however, the applicability of *Martinez* is conditioned upon him

---

[39]   *See* State Rec., Vol. 9 of 16, Second PCR, with attached Wainwright Affidavit.

showing that the ineffective-assistance-of-trial-counsel claim is "a substantial one," insofar as having "some merit." *Martinez*, 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).    Johnson has not met that burden.

He alleges that during the suppression hearing trial counsel failed to present expert testimony regarding his mental condition.    He claims that his "mental illness" was documented and shown by the fact that counsel moved for a competency determination at the start of this case and that he was ordered, as part of an earlier 2002 guilty plea that included probation, to receive mental-health treatment and counseling.

As the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense. This requirement applies to both uncalled lay and expert witnesses.

*Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted); *accord Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").    For the following reasons, Johnson

has failed to establish ineffective assistance under *Strickland*.

Johnson has presented no evidence demonstrating that an expert was available and would have testified that he had a mental health condition, much less one which prevented him from being capable of understanding or waiving his *Miranda* rights before making a statement to police.    Johnson has not identified any expert witness who was available and willing to testify.    Nor has he set forth the content or substance of the expert witness' proposed testimony.    As a result, he cannot establish that his counsel was ineffective for failing to present the testimony of a purely theoretical expert.    *Anthony v. Cain*, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue").    For this reason alone, his claim fails.

Additionally, the Court finds little support in the record to support Johnson's claim of mental illness.    The Court notes that with respect to his statement that he was found incompetent to proceed with trial, the reports issued by the sanity commission suggest he was likely malingering and simply unwilling to cooperate with the medical professionals tasked with evaluating his competency to proceed, forcing the two initial declarations of incompetency in March and May 2003.[40]    The report from ELMHS also confirmed feigned

---

[40]    *See* State Rec., Vol. 11 of 16, Minute Entry, 3/20/03 and Transcript of Hearing, 3/20/03; Minute Entry, 5/27/03, Minute Entry, 11/4/03; State Rec., Vol. 9 of 16, Sanity Report of 3/20/03; and State Rec., Vol. 12 of 16, Sanity Report of 5/27/03.

psychiatric symptoms. [41]    Once he was more cooperative with the court-appointed examiners in November 2003, he was found competent to proceed. [42]    The objective findings in this case do not support his assertion that Johnson suffers from a mental illness.

Johnson has not established a meritorious ineffective-assistance-of-trial-counsel claim.    Thus, he cannot rely on the *Martinez* exception to excuse the procedural default at issue.

In this case, Johnson has not offered any cause for the default which would excuse the procedural bar imposed by the state court.    "The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown."    *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997) (citing *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982)).

Because Johnson has not satisfied the "cause and prejudice" test, this Court must determine whether the application of the procedural bar would result in a fundamental miscarriage of justice.    A petitioner makes such a showing only if he establishes as a factual matter that he is "actually innocent" of the crime of conviction.    *Williams v. Thaler*, 602 F.3d 291, 307 (5th Cir. 2010) (citing *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995)); *McGowen v. Thaler*, 675 F.3d 482, 499 (5th Cir.), *cert. denied*, 133 S.Ct. 647, 648 (2012) (citing *Finley v.*

---

[41]    State Rec., Vol. 3 of 16.

[42]    State Rec., Vol. 4 of 16, Sanity Report of 11/4/03.

*Johnson*, 243 F.3d 215, 220 (5th Cir. 2001) and *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999)).

When a petitioner has not adequately asserted his actual innocence, however, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception.    *Glover*, 128 F.3d at 903.    Johnson does not present any claim in support of actual innocence, and the record contains nothing that suggests his actual innocence on the underlying conviction.    Because Johnson has failed to overcome the procedural default, claims 4-8 should be dismissed on that basis.

### Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of

law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that is materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. at 407-08; *White v. Woodall*, 572 U.S. 415, 426 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an

incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Id.* at 102 (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The AEDPA's deferential standards of review apply only to claims adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d); *Henderson v. Cockrell*, 333 F.3d 592, 597 (5th Cir. 2003). For unexhausted claims that were not considered on the merits in the state courts, the pre-AEDPA standard of review applies. *Id.* at 598 (citing *Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying *de novo* standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)); *see also Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009).

### Analysis of Claims for Relief

#### A. *Sufficiency of the Evidence*

Johnson asserts that the evidence presented was not sufficient to convict him of manslaughter because the case was predicated primarily on the victim's girlfriend's

identification testimony that was unworthy of belief, and there was no physical or scientific evidence linking him to the crime.    Thus, he argues that the State did not sufficiently prove his identity as the perpetrator.

This claim was never addressed on the merits by any Louisiana court.    Johnson raised the claim in his first counseled application for post-conviction relief.    The state district court did not consider the merits of the claim, and both courts of appeal denied relief without providing additional stated reasons.    The district court refused to consider the claims for relief because they were fully reviewed by the state circuit court on direct appeal. The court's impression was that the sufficiency claim had been considered on direct appeal; however, the claim raised on direct appeal was, in fact, one of suggestive identification rather than insufficiency of the evidence based on the alleged tenuous identification.    Ordinarily, a federal court looks to the last reasoned decision on direct appeal and gives deference to the court's determination.    In this case, however, the state court's disposition on procedural grounds and the failure to rule on the merits of the sufficiency claim permit the Court to review the claim *de novo*—rather than through § 2254's deferential lens.    *Landry v. Cain*, 445 F. Appx. 817, 822 n. 10 (5th Cir. 2011).

*Jackson v. Virginia*, 443 U.S. 307 (1979), provides the applicable framework for analyzing a sufficiency claim.    The *Jackson* standard requires a determination regarding whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven

beyond a reasonable doubt.    *Jackson*, 443 U.S. at 319; *Williams v. Cain*, 408 F. Appx. 817, 821 (5th Cir. 2011); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008).[43]

Review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury.    *United States v. Young*, 107 F. Appx. 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").    Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict.    *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005).

A federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder.    *Weeks v. Scott*,

---

[43]    Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does not apply in federal habeas corpus proceedings; in these proceedings, only the *Jackson* standard need be satisfied, even if state law would impose a more demanding standard of proof.    *Foy v. Donnelly*, 959 F.2d 1307, 1314 n. 9 (5th Cir. 1992); *Higgins v. Cain*, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n. 38 (E.D. La. Mar. 8, 2010), *aff'd*, 434 F. Appx. 405 (5th Cir. 2011); *Williams v. Cain*, Civ. Action No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), *aff'd*, 408 F. Appx. 817 (5th Cir. 2011); *Davis v. Cain*, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); *Wade v. Cain*, Civ. Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J. on July 3, 2008), *aff'd*, 372 F. Appx. 549 (5th Cir. Apr. 9, 2010); *see also Coleman v. Johnson*, 566 U.S. 650, 655 (2012) ("Under *Jackson*, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

55 F.3d 1059, 1062 (5th Cir. 1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985). In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.' " *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis added)).

Johnson argued in the state courts that "the only link the State had besides the farfetched statement attributed to Mr. Johnson was the one-on-one lineup that was not only unconstitutionally vague, but so unreliable that it should have been suppressed."[44]    On appeal, however, the Louisiana Fourth Circuit found no error in the trial court's denial of the motion to suppress the identification.    In fact, after considering all the *Manson* factors and weighing them against any corrupting effect of the arguably suggestive identification, the appellate court concluded that "the trial court did not abuse its discretion in finding Mrs. Price's identification of Mr. Johnson reliable under the totality of the circumstances."[45] Undeterred, Johnson raised a sufficiency of the evidence claim on post-conviction review, asserting that "the identification process may have passed constitutional scrutiny, but it does not prove that Ms. Price was correct in her identification of Mr. Johnson as being one of the perpetrators."[46]    In support of his legal sufficiency claim, he argued "the fact remains that

---

[44]  State Rec., Vol. 9 of 16, Appellant Brief, p. 6.

[45]  *State v. Johnson*, 41 So.3d at 1207.

[46]  State Rec., Vol. 9 of 16, PCR Application, p. 8.

the identification of Mr. Johnson by Ms. Price is tenuous at best, while the lack of any other evidence should be considered and given great weight in support of this argument."[47]

Keisha Price testified at trial that Johnson was one of the perpetrators involved in the vicious beating that resulted in her boyfriend's death.    That testimony alone was sufficient to support the conviction.    A single, uncorroborated eyewitness identification, if found credible by the trier of fact, is sufficient to prove identity and support a conviction under federal law.    *United States v. King*, 703 F.2d 119, 125 (5th Cir. 1983); *accord Davis v. Cain*, Civ. Action No. 15-6652, 2016 WL 4537915, at *7 (E.D. La. May 24, 2016), *adopted*, 2016 WL 4529877 (E.D. La. Aug. 30, 2016); *Colbert v. Cain*, Civ. Action No. 14-2472, 2016 WL 4186551, at *11 (E.D. La. Apr. 12, 2016), *adopted*, 2016 WL 4161257 (E.D. La. Aug. 5, 2016); *Phillips v. Cain*, Civ. Action No. 11-2725, 2012 WL 2564926, at *13 (E.D. La. Apr. 11, 2012), *adopted*, 2012 WL 2565025 (E.D. La. July 2, 2012).

Furthermore, Johnson's legal sufficiency argument focuses on credibility.    The victim's girlfriend identified Johnson at trial as one of the individuals who attacked her boyfriend in the apartment.    She testified she could see what was happening from her vantage point and that she was "a thousand percent certain" that Johnson was one of the perpetrators.    Johnson points to factors that diminished her ability to see clearly who was attacking the victim, along with various discrepancies in the clothing described and worn by the perpetrator, which he alleges create doubt surrounding her identification testimony.

---

[47]    *Id.* at 6.

However, these circumstances were brought out by counsel on cross-examination and subject to scrutiny by the jury when considering the witness's credibility.[48]    The jury obviously found her testimony reliable and credited her identification of Johnson as one of the perpetrators.

Furthermore, testimony at trial revealed that Johnson was found soon after the crime wearing bloody clothing that had been turned inside out and later made an incriminating statement to police.    Despite the defense's attempts to cast Johnson's statements to police as "farfetched and fantastical,"[49]    the jury was entitled to reject that interpretation. Likewise, the jury was free to consider and weigh expert Anne Montgomery's explanation for why the samples from bloodied clothing worn by Johnson may have produced inconclusive DNA results.

The *Jackson* standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.    *Jackson*, 443 U.S. at 319.    To the extent his sufficiency claim is based on arguments concerning witness credibility, a federal habeas court generally will not grant relief.    *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review.");

---

[48]   State Rec., Vol. 13 of 16, Trial Transcript (Day 3) – December 15, 2008, p. 93.

[49]   State Rec., Vol. 13 of 16, Trial Transcript (Days 1 and 2 – December 10 and 11, 2008), p. 125.

*Ramirez*, 398 F.3d at 695 ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); *McCowin v. Scott*, Civ. Action No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); *Phillips v. Cain*, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), *adopted*, 2012 WL 2565025, at *1 (E.D. La. July 2, 2012); *Picou v. Cain*, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).    The jury was entitled to resolve any inconsistencies or discrepancies in the evidence and testimony against Johnson, and apparently did so.    Johnson asks the Court to substitute its own analysis for that of the jurors in this case and reach a different conclusion. However, a federal court is not at liberty to second-guess the weight afforded the evidence or the jury's credibility determinations.

Here, the evidence, when viewed in the light most favorable to the prosecution, could permit any rational trier of fact to find beyond a reasonable doubt that Johnson was one of the perpetrators in the attack on the victim.    Johnson is not entitled to relief on this claim.

B. *Conflict of Interest*

Johnson claims that he was denied the effective assistance of counsel due to a conflict of interest because the trial counsel he retained for his second trial served as his former public defender for the first trial and concurrently represented both him and his co-defendant during the first trial by "flipping" representation with another public defender appointed to represent the co-defendant.    The conflict-of-interest claim was raised on direct appeal and rejected for the following stated reasons:

Mr. Johnson argues that the trial court erred in denying his repeated objections regarding the conflict of interest presented by his defense counsel, Shelly Vix, which prevented him from having a fair trial. He contends that the conflict of interest began with the mingled and undefined joint representation of him and his co-defendant, Mr. Kelson, by Ms. Vix and another appointed attorney, John Fuller, who were both from the same office—the Orleans Indigent Defender Program ("O.I.D.P."). This joint representation by two O.I.D.P. attorneys continued through all pre-trial proceedings and through the joint first trial of Mr. Johnson and Mr. Kelson. Mr. Johnson further claims that he raised the conflict of interest issue three times before and during this second trial by pro se motions to quash. He still further claims that the trial court erred in ruling that the conflict of interest could be handled in post conviction proceedings.

In support of his contention, Mr. Johnson points out that on January 30, 2007, Stephen Singer, Chief of Trials for the newly-created Orleans Defender Program ("O.D.P"), filed a Motion to Withdraw from Representing Mr. Johnson or Mr. Kelson. This motion was filed on behalf of any attorney employed by the O.D.P. and requested appointment of separate counsel independent of the O.D.P. In this motion, Mr. Singer stated that the two former O.I.D.P. appointed attorneys, Ms. Vix and Mr. Fuller, had a single case file and "flip flopped representation between both of the co-defendants [ (Mr. Johnson and Mr. Kelson) ]." On February 12, 2007, the trial court granted the motion.

After this motion was granted, the trial court appointed new counsel for both Mr. Johnson and Mr. Kelson. On April 24, 2007, Mr. Johnson's appointed counsel filed a motion to sever. On June 11, 2007, Mr. Johnson's motion to sever was denied. Although Mr. Johnson objected and gave notice of his intent to seek writs, no writ application was filed. The trial court then set the matter for a pretrial conference on December 21, 2007. On that date, Mr. Johnson's appointed counsel's motion to withdraw was granted, and Ms. Vix—who formerly was Mr. Johnson's appointed counsel—enrolled as his privately retained counsel.

On January 16, 2008, the other defendant, Mr. Kelson, filed a motion to sever, alleging that Ms. Vix had a conflict of interest because she had previously been employed with O.I.D.P. and because she had acted as his counsel at certain pretrial proceedings which occurred before the first trial. On January 18, 2008, the trial court, over the State's objection, granted Mr. Kelson's motion to sever on the grounds that there had been a conflict because both attorneys had been

from the same public defender's office—O.I.D.P.—and that if either Mr. Johnson or Mr. Kelson were to testify, each would accuse the other. Although the State filed a writ application from that ruling, this court denied the State's writ. Ms. Vix then represented Mr. Johnson as his retained counsel through his second trial. On appeal, Mr. Johnson contends that because of Ms. Vix's prior joint representation as O.I.D.P. appointed counsel of him and Mr. Kelson there was a conflict of interest that prejudiced him.

Joint representation is not per se illegal and does not violate the right to assistance of counsel under the Sixth Amendment to the U.S. Constitution or Article 1, Section 3 of the Louisiana Constitution unless it gives rise to an actual conflict of interest. *State v. Kahey*, 436 So.2d 475, 484 (La. 1983) (citing *State v. Ross*, 410 So.2d 1388 (La.1982)). An actual conflict of interest is defined as follows:

> If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant is sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.

*Kahey*, 436 So.2d at 484–85 (quoting *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979)). Generally, "Louisiana courts have held that an attorney laboring under an actual conflict of interest cannot render effective legal assistance to the defendant she is representing." *State v. Cisco*, 01–2732, p. 16 (La. 12/3/03), 861 So.2d 118, 129 (citing *State v. Franklin*, 400 So.2d 616, 620 (La. 1981)).

In *Cisco*, *supra*, the Louisiana Supreme Court reversed a defendant's capital murder conviction and death sentence due to the defendant's attorney simultaneously representing the defendant, the lead deputy sheriff investigator in his case, and the deputy sheriff's wife. The attorney represented the deputy sheriff and his wife in a domestic matter. The State's case against the defendant rested on the defendant's multiple statements, nineteen of which were introduced at trial. The majority of the statements, certainly the most damning of them, were secured by the deputy sheriff alone or at his direction during the time the attorney represented both the defendant and the deputy sheriff. The Supreme Court held that defendant's attorney "was necessarily confronted with an actual conflict of interest when she was called upon to cross examine her client [the deputy sheriff] ... at the trial of her other client, the defendant." *Cisco*, 01–2732 at pp. 20–21, 861 So.2d at 132.

In this case, two O.I.D.P. attorneys—Ms. Vix and Mr. Fuller—represented both Mr. Johnson and his former co-defendant, Mr. Kelson, at times during the pre-trial proceedings leading up to their joint first trial. As a result, a potential conflict existed at the time of the first trial in this matter. On December 10, 2003, both Mr. Johnson and Mr. Kelson on the record waived any potential conflict in the joint representation by O.I.D.P. attorneys; however, there was no indication that independent counsel advised Mr. Johnson and Mr. Kelson of the possible risks associated with conflicted counsel. At this time of the waiver, Ms. Vix informed the trial court that she would advise the court of any conflicts if they were to later arise.

At the January 18, 2008, hearing on Mr. Kelson's motion to sever, the trial court questioned Ms. Vix about the waiver; she replied "that the Court was aware at that time of what the attorneys thought was a[sic] obvious conflict." Ms. Vix also explained that she had represented Mr. Johnson, her present client, at the first trial. She averred that they had asked for a continuance of the trial and "pointed out that there was a conflict the day of trial" although there was no record, even in the minute entry, that this occurred. Upon further questioning by the trial court, Ms. Vix stated that neither Mr. Johnson nor Mr. Kelson testified at the trial and that the only inculpatory statement that was introduced came from Mr. Johnson (his own statement) and inculpated only him. As noted, the trial court ultimately granted Mr. Kelson's motion to sever.

In granting the motion to sever, the trial court never suggested to Ms. Vix that her representation of Mr. Johnson was either inappropriate or unethical. The trial court, however, at the same January 18, 2008, hearing appointed an independent attorney to discuss with Mr. Johnson the possibility of a conflict of interest arising from Ms. Vix representing him as his retained counsel. After consulting with the independent counsel, Mr. Johnson was sworn in and waived any apparent or possible conflict arising from Ms. Vix formerly representing Mr. Kelson in pretrial matters and the O.I.D.P. attorneys having a joint file.

On December 10, 2008, the first day of Mr. Johnson's retrial, the conflict of interest issue was raised again by Mr. Johnson in a pro se motion to quash his indictment. In his motion to quash, he alleged ineffective assistance of counsel due to an alleged conflict of interest from the beginning of the case. He claimed that the conflict of interest had severely prejudiced him, tainted the verdict at his first trial, and could only be repeated at his second trial. He also alleged

that due to the passage of time between the crime and Hurricane Katrina he had been permanently and irreversibly prejudiced. Mr. Johnson argued that he had never had any meaningful defense and that effective counsel would have challenged more issues in his case. In denying Mr. Johnson's motion to quash, the trial court stated:

> [Y]ou have been represented by separate counsel for this separate trial. Ms. Shelly [sic] was your attorney for the first trial and now she is your attorney for the second trial. Your co-defendant was represented by John Fuller and then later was represented by a different lawyer. So, I do not find that you have a conflict that would permanently and irreversibly prejudice your defense.

The trial court further stated that the conflict of interest issue was not a ground for a motion to quash the indictment, but rather the conflict of interest issue was more properly raised post-trial. Mr. Johnson lodged an objection to the ruling.

During the trial, the conflict of interest issue arose again in connection with an objection lodged, apparently by the State, regarding a former O.I.D.P. attorney, Suzanne LeVert, sitting at the defense table with Ms. Vix during trial. Mr. Johnson's trial counsel, Ms. Vix, stated for the record that Ms. LeVert was not there to participate in the trial; rather, she was there to assist Ms. Vix who was trying the case alone. Ms. LeVert did not have a speaking role in the trial. Ms. Vix noted that she had informed the court about Ms. LeVert's presence. The trial court responded that it was told Ms. LeVert would sit behind Ms. Vix, but Ms. LeVert was sitting next to Ms. Vix.

The trial court addressed Mr. Johnson and asked him if he waived any conflict relating to Ms. LeVert's presence at the defense table. Mr. Johnson responded that he had no conflict because it did not matter if it was Ms. Vix or another attorney he named, that it did not matter. He explained that it did not matter because his case had been damaged "beyond irreversible prejudice," and thus it did not matter who represented him. Mr. Johnson further explained that "[t]hey're behind me, you know, they're doing a good job." Quoting from his motion to quash, Mr. Johnson stated that even if two new attorneys without any conflict were appointed to represent him and Mr. Kelson, those two attorneys would be laboring under the severe handicap of the case being several years old. The trial court asked Mr. Johnson if he basically felt that the prejudice was beyond "fixing it," and Mr. Johnson replied in the affirmative.

The trial court stated that the conflict had been waived and asked Mr. Johnson if he understood that. Mr. Johnson replied in the affirmative.

On appeal, Mr. Johnson contends that Ms. Vix took (or failed to take) certain steps in his defense because she had previously appeared on behalf of his former codefendant, Mr. Kelson. He points out that throughout the trial evidence pertaining to Mr. Kelson was admitted without Ms. Vix objecting despite the irrelevance of this evidence to Mr. Johnson's case. For instance, results of the testing of Kelson's clothing for the victim's DNA was admitted, and Ms. Price stated that she heard the victim call out only "Quani," Mr. Kelson's apparent nickname. Mr. Johnson contends that Ms. Vix should have attacked or dispelled the association between him and Mr. Kelson, but she was precluded from doing so due to her conflicting loyalty to Mr. Kelson. This line of reasoning is unpersuasive. Given that the State's theory was that Mr. Johnson and Mr. Kelson committed the crime together, the evidence against Mr. Kelson was relevant to the issue of Mr. Johnson's guilt.

Contrary to Mr. Johnson's contention, the record does not reflect that Ms. Vix's performance either during the pretrial proceedings leading up to the second trial or at the second trial was affected by her prior appearances on Mr. Kelson's behalf before the first trial. In the proceedings leading up to the second trial, Ms. Vix reurged on Mr. Johnson's behalf motions to suppress. At trial, Ms. Vix thoroughly cross examined the witnesses against Mr. Johnson. While Ms. Vix jointly represented both Mr. Kelson and Mr. Johnson at a motion to suppress hearing held before the first trial, most of her other appearances on behalf of Mr. Kelson were perfunctory. Thus, the record supports the trial court's finding of no actual conflict of interest in Ms. Vix representing Mr. Johnson in connection with his second trial.

Mr. Johnson cites *Cisco, supra*, for the proposition that a trial court has a duty to avoid a possible conflict of interest. He notes that in *Cisco, supra*, as in this case, the trial court was notified of the conflict. Mr. Johnson's reliance on the *Cisco* case is misplaced. Unlike in *Cisco, supra*, in which there was an actual conflict of interest, as indicated above, no actual conflict of interest was presented in this case. Ms. Vix's prior appearance on behalf of Mr. Johnson's codefendant Mr. Kelson at the first trial did not affect her performance in representing Mr. Johnson at his second trial and the pretrial proceedings leading up to that trial.

Mr. Johnson also cites Rule 1.9 of the Louisiana Rules of Professional Conduct,

which provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interest are materially adverse to the interest of the former client unless the former client gives informed consent, confirmed in writing." Mr. Johnson, however, cites no authority for the proposition that a violation of an ethical rule is a ground for reversal of a defendant's criminal conviction and sentence. The Louisiana Supreme Court has recognized, at least in civil cases, that the Rules of Professional Conduct have the effect of substantive law. *See Succession of Cloud*, 530 So.2d 1146, 1150 (La. 1988). In this case, assuming arguendo that the Rules of Professional Conduct apply, as noted above, no actual conflict existed as to Ms. Vix's representation of Mr. Johnson at his second trial and the pretrial proceedings leading up to that trial. Thus, even assuming that a violation of the ethical rules could constitute reversible error, any such error was harmless.

Mr. Johnson also argues that the trial court erred in failing to comply with the dictates of La. C.Cr.P. art. 517. Article 517 imposes on a trial court an affirmative duty in cases of joint representation to advise the defendant of the right to conflict-free representation. La. C.C.P. art. 517, Comment (b). This court has construed Article 517 as strictly a procedural vehicle designed "to lessen the possibility that after conviction a jointly-represented defendant will assert a claim that his counsel was not conflict-free and thus was ineffective." *State v. Miller*, 00–0218 (La. App. 4 Cir. 7/25/01), 792 So.2d 104, 113–15. This court also has held that a trial judge's failure to comply with Article 517 does not rise to a denial of a constitutional right and that such a failure is subject to a harmless error review. *Id.*

Under the facts of this case Article 517 does not apply. Mr. Johnson and Mr. Kelson were not jointly represented by the same counsel or by counsel associated in the practice of law in their second trial or in the proceedings leading up to it. Any effect of the prior representation at the first trial and in the pretrial proceedings leading up to the first trial was addressed by the trial court; hence, the trial court effectively complied with the article. Regardless, the failure of a trial court to follow La. C.Cr.P. art. 517 is subject to harmless error review. *Miller, supra*. Considering the facts and circumstances of the instant case, even assuming arguendo the trial court failed to fulfill its duty under La. C.Cr.P. art. 517, the guilty verdict rendered in the instant case was

not attributable to such lapse. There is no merit to this assignment of error.[50]

Here, the appellate court relied on state supreme court law interpreting and applying federal law regarding conflict of interest and effective representation.    The state court's rejection of the claim was not contrary to, or an unreasonable application of, controlling United States Supreme Court precedent.

A criminal defendant is entitled to the effective assistance of counsel free from conflict that can typically arise from multiple representation of defendants.    *Strickland v. Washington*, 466 U.S. 668 (1984); *Holloway v. Arkansas*, 435 U.S. 475 (1978); *Cuyler v. Sullivan*, 446 U.S. 335 (1980).    In *Strickland*, the Supreme Court noted that "prejudice is presumed when counsel is burdened by an actual conflict of interest because in those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties."    *Strickland*, 466 U.S. at 692.    However, the presumption of prejudice applies only if defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."    *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. at 350).    The Supreme Court has only applied the presumption to conflicts of interest arising from multiple concurrent representation of defendants and seemingly limited the scope of the rule to those instances.    *Mickens v. Taylor*, 535 U.S. 162, 172-175 (2002).    Although Johnson implies his attorney's conflict of interest arose from multiple representation based on the shared representation that occurred between the

---

[50]    *State v. Johnson*, 41 So.3d at 1198-1203.

public defenders appointed in the first joint trial, the case appears to be one of conflict of interest in the successive representation context, given the evidence that his retained defense counsel for the second trial had *previously* represented his co-defendant.     The *Cuyler* presumption of prejudice has never been applied by the Supreme Court to conflicts of interest stemming from successive representation.

A defendant must first establish an actual conflict of interest existed and adversely affected his lawyer's performance.     In the instant case, the evidence shows only a potential conflict that was knowingly and voluntarily waived.     The existence of a potential or theoretical conflict alone is insufficient to impugn a criminal conviction.     To demonstrate a violation under the Sixth Amendment, a petitioner must establish the existence of an actual conflict of interest that adversely affected his lawyer's performance.     *Cuyler v. Sullivan*, 446 U.S. at 344.     An "actual conflict" exists when counsel "is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests."     *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). An "adverse effect" requires proof that " 'some plausible alternative defense strategy or tactic' could have been pursued but was not because of the actual conflict impairing counsel's performance."     *Id.*

Here, the court of appeal resolved that retained counsel did not have an actual conflict of interest that adversely affected her performance during the second trial.     In reaching this conclusion, the court of appeal considered Johnson's argument regarding the comingled

representation afforded by the two public defenders to him and his co-defendant during the first trial that led the Orleans Parish Public Defender's Office (OPD) to withdraw for conflict during the second trial.[51]    However, the court of appeal also weighed the fact that Johnson and his co-defendant were each appointed separate and independent counsel after the OPD's prompt withdrawal, and that Johnson then voluntarily retained as his personal counsel and in a private capacity the former public defender who represented him during the first criminal trial.    The potential for conflict was raised and discussed at length during the hearing on co-defendant's motion to sever, at which counsel for co-defendant maintained that although Johnson had the right to counsel of his choice, the co-defendant should not suffer as a result should he, for instance, decide to testify.[52]    Ms. Vix had no objection to the severance.    As to any conflict, however, she informed the trial court that Johnson was aware of the potential conflict of interest and was ready to waive his rights and proceed with Ms. Vix as counsel.    The trial court allowed for that waiver by appointing separate counsel to speak with Johnson alone during the hearing to explain any potential conflicts that might exist and his ability to waive his right to conflict-free counsel.    Following the discussion, Johnson was questioned by the prosecutor regarding his understanding that Ms. Vix at one

---

[51]    State Rec., Vol. 12 of 16, Motion to Withdraw Representation filed by Stephen Singer, Chief of Trials.

[52]    State Rec., Vol. 14 of 16, Transcript of Hearing on Motion to Sever (Jan. 18, 2008), p. 4.    Ms. Vix informed the trial court that neither defendant testified at the first trial.    *Id.* at p. 6.

point represented his co-defendant at least in pretrial matters and had access to a joint defense file.    He indicated he understood and had no issue with Ms. Vix serving as his attorney.[53]    At no point during the trial proceedings did Johnson indicate that he wanted to discharge his attorney.    Thus, the record shows that Johnson knowingly and voluntarily waived his right to conflict-free counsel.    He had guidance in doing so and was afforded independent legal counsel and advice regarding the potential for conflict and waiver.

The trial court revisited the conflict issue several times during trial in the context of a pro se motion to quash the indictment and motion for mistrial.    Johnson did not contest the waiver.    Rather, as he made clear, he felt he could never get a fair trial and was irreversibly prejudiced no matter who represented him.[54]    He referenced the OPD motion to withdraw and reiterated that he would still be prejudiced if two entirely new independent attorneys without any conflict were appointed now simply due to the length of time that had passed since the crime.[55]    He repeated several times on the record that he understood the issue and had no objection to Ms. Vix's representation and waived the conflict.    The trial court also explored Ms. Levert's minimal involvement in the past and current criminal proceedings and ensured that Johnson understood the import of Ms. Levert's presence, as a

---

[53]   *Id.* at pp. 12-16.

[54]   State Rec., Vol. 13 of 16, Trial Transcript (December 10 and 11, 2008), p. 4.    The trial court set forth on the record Johnson's stated grounds for his motion to quash in its oral ruling denying the motion.    *See also* Trial Transcript (December 15, 2008), pp. 6-10.

[55]   State Rec., Vol. 13 of 16, Trial Transcript (December 10 and 11, 2008), p. 96.

public defender with the conflicted PDO, during trial.[56]    Even though Johnson stated he waived any potential conflict, the trial court took extra precaution and barred her from returning to the courtroom for the last day of trial.

Johnson failed to demonstrate that an actual conflict of interest existed based on his former public defender's role in representing his co-defendant in pretrial matters during the first criminal trial and her successive representation of Johnson in a private capacity when retained by him during the second trial.    The OPD's withdrawal from concurrently representing Johnson and his co-defendant does not inevitably make Ms. Vix's independent representation of Johnson improper.    Immediately after the withdrawal was granted, each defendant was appointed new counsel and subsequently represented by independent counsel throughout the proceedings.    When Johnson retained Ms. Vix to represent him, she was no longer with the public defender's office and did not represent Kelson.    Their cases were severed and tried separately in June 2008 and December 2008, respectively.    This significantly reduced the potential for divergence in their interests.    Neither the withdrawal of OPD nor grant of severance leads to the conclusion that an *actual* conflict automatically arose and existed during the representation that adversely impacted his lawyer's performance.    Johnson offers no objective evidence that counsel was placed in a position that would force her to make choices advancing Kelson's interests over his, and that

---

[56]  State Rec., Trial Transcript (December 10, 11, 2008), pp. 92-97; Tr. (December 15, 2008), p. 8.

counsel actually did so.    No actual conflict that adversely affected his counsel's performance has been shown.    *See*, *e.g.*, *Wilkins v. Stephens*, 560 F. Appx. 299, 309 (5th Cir. 2014) (finding no denial of right to unconflicted counsel for any actual conflict of interest where defendant's attorney in capital murder trial for two victims had previously represented another of defendant's claimed victims [as confessed by defendant to police during questioning and used only during the sentencing phase] in probation revocation proceedings twenty years earlier) (citing *Perillo v. Johnson*, 205 F.3d 775, 798 (5th Cir. 2000); *Simmons v. Lockhart*, 915 F.2d 372 (8th Cir. 1990) (fact that defense attorney in murder case previously represented key prosecution witness in an unrelated matter was a theoretical conflict of interest that did not adversely impact the defense attorney's performance).

Finally, the Court notes that Johnson also raised state-law ethical issues on appeal in connection with this claim.    The appellate court rejected those arguments, finding no authority suggesting that violations of ethical rules, even if it occurred, would be grounds for reversal of his criminal conviction.    Even if state ethics law was implicated or violated, this Court's federal habeas corpus review does not extend to alleged state-law ethics transgressions.    Federal habeas corpus relief may be granted only to remedy violations of the federal Constitution and laws of the United States; mere violations of state law will not suffice.    28 U.S.C. § 2254; *Engle v. Isaac*, 456 U.S. 107, 119 (1983).    A federal habeas court is not at liberty to determine petitioner's rights under "state recusal statutes or ethical canons as such."    *Richardson v. Quarterman*, 537 F.3d 466, 474 (5th Cir. 2008).

Regardless, the alleged breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel.    *See Mickens v. Taylor*, 535 U.S. 162, 176 (2002) (citing *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986); *Chester v. Vannoy*, Civ. Action No. 16-17754, 2018 WL 2970912, at *6 (E.D. La. June 11, 2018).    Thus, for the reasons stated, Johnson is not entitled to relief on this claim.

### C.  *Excessive/Greater Sentence Following Retrial*

Johnson argues that the "virtual life-sentence of 80 years" he received for manslaughter as a second-felony offender after his second trial, as opposed to the 50-year enhanced sentence imposed after the first trial, is constitutionally excessive and "smacks of vindictiveness."    These claims were considered on the merits and rejected by the Louisiana Fourth Circuit on direct appeal.

#### 1.  Excessive Sentence

As for his excessive-sentence claim, the appellate court found that the trial court's reasons for sentencing more than adequately complied with Louisiana Code of Criminal Procedure article 894.1.    After reviewing sentences imposed in similar cases and finding Johnson's sentence comparable, the appellate court concluded that the 80-year sentence was not excessive.    The appellate court reasoned:

> In this case, Mr. Johnson was one of two men who viciously beat and stomped the victim, fatally wounding him and discarding him in a dumpster. Although Mr. Johnson had a prior conviction, his prior criminal record apparently was not as extensive as the defendant in *Walker, supra*. Nonetheless, the circumstances of the killing in this case were much worse than those in the other cases cited above, in which maximum sentences as second offenders

were upheld, even though the maximum sentence available at the time of those offenses was forty-two years, almost half of the sentence the appellant received. The Legislature saw fit to almost double the maximum sentence for manslaughter, and we cannot conclude that the resulting increase of the maximum sentence for a second offender is constitutionally excessive in this case. Although the sentence imposed on Mr. Johnson is severe and there is no indication that he has a lengthy prior record or record of violent offenses, it cannot be said that the sentence is nothing more than the purposeless imposition of pain and suffering or is grossly disproportionate to the severity of the crime. The record supports the sentence imposed by the trial court. We thus find no abuse of the discretion in the trial court's imposing the maximum eighty year sentence.

To the extent Johnson contends his sentence is excessive under Louisiana law or that the trial court failed to comply with state sentencing rules, his claim is not cognizable in this federal proceeding. *Smith v. Cain*, 253 F.3d 700, 2001 WL 498441, at *1 (5th Cir. Apr. 9, 2001). These alleged errors cannot be remedied in a federal habeas corpus proceeding. *See, e.g., Butler v. Cain*, 327 F. Appx. 455, 457 (5th Cir. 2009) (claim that sentence violated state law is not cognizable in federal habeas proceeding.); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987) ( "... a state's failure to follow its own sentencing procedures is not reviewable by federal habeas corpus.... [T]his Court will not review the state court's findings regarding the constitutionality of petitioner's sentence under state law.").

As for his claim that his sentence is excessive under federal law, the Eighth Amendment prohibits sentences that are grossly disproportionate to the crime committed. *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003) (rejecting a proportionality challenge where the defendant was sentenced to two consecutive terms of 25 years to life for two felony counts of petty theft for stealing $150.00 worth of videotapes); *Solem v. Helm*, 463 U.S. 277, 291-92

(1983) (holding that the Eighth Amendment prohibited a life sentence without the possibility of parole for a recidivist offender convicted of "uttering a 'no account' check for $100"); *Rummel v. Estelle*, 445 U.S. 263 (1980) (rejecting a proportionality challenge where the defendant, who had three prior non-violent felony offenses, had been sentenced to life imprisonment under a recidivist statute following his conviction for obtaining $120.75 by false pretenses); *see also McGruder v. Puckett*, 954 F.2d 313, 315 (5th Cir. 1992).    As the Supreme Court recognized in *Lockyer*, "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case."    *Lockyer*, 538 U.S. at 72-73 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (rejecting a proportionality challenge for sentence of life in prison without parole for the possession of more than 650 grams of cocaine)).

In determining if a sentence is greatly disproportionate, the Fifth Circuit framework dictates that courts first "makes a threshold comparison of the gravity of the offense against the severity of the sentence."    *McGruder v. Puckett*, 954 F.2d at 316.    "Only if we infer that the sentence is grossly disproportionate to the offense will we then…[] compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions."    *Id.*    If the sentence is not "grossly disproportionate" in the first instance, however, the inquiry is finished.    *Harmelin*, 501 U.S.

at 1005 ("[I]ntrajurisdictional and interjursdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."); *United States v. Gonzales*, 121 F.3d 928, 942 (5th Cir. 1997), *overruled on other grounds by United States v. O'Brien*, 560 U.S. 218, 130 S.Ct. 2169, 176 L.Ed.2d 979 (2010)).    The Fifth Circuit applies this framework utilizing *Rummel* as "a benchmark for claims of disproportionate punishment under the Eighth Amendment."    *Id.* at 943.

Johnson's situation does not qualify as an extraordinary case where the sentence is unconstitutionally disproportionate to the crime.    He was originally charged with second-degree murder.    His first trial ended with a verdict of guilty of manslaughter.    The conviction and sentence in that case were vacated, however, due to missing transcripts following Hurricane Katrina.    His second trial on the charge of manslaughter ended in a guilty verdict and he was sentenced to 40 years' imprisonment.    He was adjudicated a second-felony offender.    The trial court vacated the original sentence and resentenced him to 80 years' imprisonment.    His 80-year sentence, albeit the maximum allowed, falls within the limits set by the Louisiana legislature for a second-felony offender under Louisiana Revised Statute 15:529.1.    Furthermore, when evaluating the excessiveness of a sentence imposed under a habitual offender statute, a court must be mindful that the "sentence is imposed to reflect the seriousness of [petitioner's] most recent offense, not as it stands alone, but in the light of his prior offenses."    *McGruder v. Puckett*, 954 F.2d at 316.    Here,

Johnson's sentence reflected both the seriousness of the charged offense and his prior criminal conduct.

The Louisiana Fourth Circuit Court of Appeal highlighted factors the trial court emphasized that sufficiently explained why the sentence of 80 years was proportionate and warranted for this crime:

• Mr. Johnson's conduct during the commission of the crime manifested deliberate cruelty to the victim and created a risk of death or great bodily harm to more than one person, including Ms. Price, who jumped from a second floor window.

• Mr. Johnson used threats of or actual violence in the commission of the offense, specifically in the manner and mode of death, which the court found excessive; the court referred to the beating and multiple stab wounds.

• The offense resulted in a significant permanent injury or significant economic loss to the victim or his family; the victim would never see his child, referring to Ms. Price being pregnant with the victim's child at the time of his death.

• Mr. Johnson used a dangerous weapon in the commission of the offense, mentioning a knife and a boot.

• Mr. Johnson was a leader or his violation was in concert with one or more persons; the court referred to Mr. Johnson telling the victim to "take it like a man" as he was being beaten to death and stabbed repeatedly.

Thus, given the violent nature of the instant crime and his criminal history, this case

simply does not qualify as a rare situation in which the difference between the crime and the sentence was unconstitutionally disproportionate.    Johnson fails to demonstrate that the adjudication of his excessive sentence claim was contrary to or involved an unreasonable application of clearly established Supreme Court law.    Accordingly, he is not entitled to relief on the excessive sentence claim.

2.   Increased Sentence Upon Retrial

Johnson argues that the more severe 80-year sentence he received after retrial was purely vindictive in violation of *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).    In rejecting this claim on direct appeal, the Louisiana Fourth Circuit reasoned:

> Mr. Johnson next argues that the trial court erred in sentencing him to a more onerous sentence than he received after his first trial and conviction.
>
> Mr. Johnson's argument is based on *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), in which the Supreme Court held that when a judge imposes a greater sentence after a retrial, there is a presumption that the greater sentence is the product of vindictiveness unless the court sets forth reasons for the increase, based upon "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." *Pearce*, 395 U.S. at 726, 89 S.Ct. 2072. The Supreme Court's ruling was based on the possibility that a trial court would increase a defendant's sentence after retrial in retaliation for the defendant having appealed his first conviction, resulting in a chilling effect on a defendant's due process right to appeal.
>
> The holding in *Pearce* was limited in *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973), in which the Supreme Court found that the imposition of a greater sentence by a different jury after retrial did not violate the defendant's due process rights. The Supreme Court noted that because the jury that imposed the greater sentence was not the same jury that imposed the

original sentence, the second jury had no personal stake in the prior conviction and sentence, and thus vindictiveness could not be presumed solely because the second jury imposed a greater sentence. The Supreme Court reasoned: "Pearce was not written with a view to protecting against the mere possibility that, once the slate is wiped clean and the prosecution begins anew, a fresh sentence may be higher for some valid reason associated with the need for flexibility and discretion in the sentencing process. The possibility of a higher sentence was recognized and accepted as a legitimate concomitant of the retrial process." *Chaffin*, 412 U.S. at 25, 93 S.Ct. 1977. The Court also rejected the defendant's claim that his due process rights had been violated even in the absence of vindictiveness because he was exposed to a greater sentence, thereby casting a chilling effect on his right to appeal. "To the contrary, the Court [in *Pearce* ] intimated no doubt about the constitutional validity of higher sentences in the absence of vindictiveness despite whatever incidental deterrent effect they might have on the right to appeal." *Chaffin*, 412 U.S. at 29, 93 S.Ct. 1977.

The holding in *Pearce* was further limited in *Texas v. McCullough*, 475 U.S. 134, 106 S.Ct. 976, 89 L.Ed.2d 104 (1986), in which, pursuant to the defendant's election, a jury imposed a sentence after his first conviction. The trial court granted the defendant's new trial motion, and on retrial the defendant was convicted of the same offense. The defendant elected to have the court sentence him, and the court imposed a greater sentence. The court gave findings of fact for the greater sentence, which included facts not elicited at the first trial. The court also noted that had it imposed the first sentence, it would have imposed a greater sentence than the jury did. On review, the Supreme Court found no presumption of vindictiveness in that the trial court granted the defendant his new trial. The Supreme Court noted that the defendant chose to be resentenced by the trial court, and thus a different entity imposed the second sentence. Nonetheless, the Supreme Court noted: "Where the prophylactic rule of *Pearce* does not apply, the defendant may still obtain relief if he can show actual vindictiveness upon resentencing." *McCullough*, 475 U.S. at 138, 106 S.Ct. 976. Because there was new evidence not elicited at the first trial that supported the increased sentence, the Supreme Court found that the defendant failed to show that the imposition of the greater sentence constituted vindictiveness.

The holding in *Pearce* was still further limited in *Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). The defendant had received a sentence in exchange for a guilty plea that he subsequently successfully had

vacated. He went to trial, and after his conviction the court imposed a greater sentence. The Supreme Court found that the imposition of the greater sentence after trial did not violate the defendant's due process rights despite that the same judge imposed both the earlier sentence and the greater sentence after trial. The Supreme Court noted that after trial the judge would have more information upon which to base the sentence. The Supreme Court remanded the case for consideration of the defendant's claim that he could prove actual vindictiveness.

Our research revealed no published cases in which this court has considered the claim at issue with respect to an increased second sentence that was imposed by a different trial judge. In *State v. Howard*, 02–2435 (La. App. 4 Cir. 3/19/03), 843 So.2d 439, the same judge imposed a slightly greater sentence after remand from this court. This court vacated the defendant's sentence and remanded for resentencing because the judge did not set forth reasons for the increased sentence. In *State v. Bertrand*, 04–1496 (La. App. 4 Cir. 12/15/04), 891 So.2d 752, this court found no *Pearce* violation when the same judge imposed a greater sentence on remand because the original sentence was illegally lenient.

In *State v. Morgan*, 08–1299 (La. App. 5 Cir. 5/26/09), 15 So.3d 1026, the court found that even though the presumption of vindictiveness did not apply because the judge who imposed the greater sentence was not the same one who imposed the original sentence, the defendant may be entitled to relief from the greater sentence if he affirmatively proves actual vindictiveness. The court noted that because vindictiveness is not presumed, the burden shifts to the defendant to show that the reason for the greater sentence is a product of vindictiveness and not based on other considerations.

In so holding, the *Morgan* court discussed *State v. Rodriguez*, 550 So.2d 837 (La. App. 2 Cir. 1989), in which the court upheld the increased sentence because it was based on new, objective information concerning the defendant's prior criminal record that was not available to the first sentencing judge, thus defeating any claim of vindictiveness. The *Morgan* court also discussed *State v. Neville*, 572 So.2d 1161 (La. App. 1 Cir.1990), in which the defendant was originally convicted on two counts and given a total term of thirty-five years. On review, a federal court found a double jeopardy violation, dismissed one of the counts, and remanded the case. A different judge then imposed a thirty-four-year sentence on the remaining count, indicating that he did so to be consistent with the original sentencing judge's intention that the

defendant serve thirty-five years imprisonment. The appellate court found that because no vindictiveness could be presumed, the second judge did not need to consider the defendant's intervening conduct or state any reasons for the greater sentence except those necessary under La. C.Cr.P. art. 894.1 to support the sentence.

The *Morgan* court also looked at *State v. Garrett*, 08–1752 (Ohio App. 2 Dist. 4/11/08), 2008 WL 1115246, in which the court found that vindictiveness was established because there was nothing in the record to support the imposition of the harsher sentence; the facts of the case and of the defendant's circumstances had not changed; the increase was substantial; and the State did not recommend the greater sentence. The *Morgan* court also cited *U.S. v. Anderson*, 440 F.3d 1013 (8th Cir. 2006), in which the court found that the increased sentence, imposed by a different judge, was based on the second judge's views that were unrelated to the prior appeal.

After considering these cases, the *Morgan* court found a complete absence in the record before it of any relevant facts elicited after the first sentencing that would justify the greater sentences, which because they were to be served consecutively increased the total years served dramatically. The court noted that the second judge commented that he had "unbridled discretion" to impose the increased sentence. The court concluded:

> We note it is possible, based on the record, that the trial judge may not have had a personal animus against defendant, but rather, he may have thought concurrent sentences were too lenient considering the disturbing facts of this case, that defendant raped his own biological daughter numerous times over a period of years. However, since the trial court did not provide reasons for the increased sentence on remand after appeal, we vacate defendant's enhanced sentence and remand this matter to the trial court for resentencing with orders that the trial court provide reasons for the sentence imposed.

*Morgan*, 08–1299 at p. 10, 15 So.3d at 1031–1032.

On remand, the same judge re-imposed the same sentence on one count but increased the sentence on the second count by five years and again ordered that the sentences be served consecutively. On review, the appellate court upheld the sentences, finding that the court set forth sufficient reasons for the sentence, which was fifteen years greater than the original sentence. *State v.*

*Morgan*, 09–0694 (La. App. 5 Cir. 2/23/10), 34 So.3d 909. The court also noted that because the judge who imposed the most recent sentence was not the same judge who imposed the original sentence, there was no presumption of vindictiveness, and the defendant had the burden of showing that the greater sentence was the product of vindictiveness. The court found that the defendant did not meet this burden because the judge set forth sufficient reasons for his increase of the sentence, including the fact that the original sentence on one of the counts was illegally lenient.

After his first conviction, Mr. Johnson was sentenced to the maximum sentence for manslaughter, forty years at hard labor. After being adjudicated a second-felony habitual offender, the trial court vacated the original sentence and resentenced Mr. Johnson to fifty years at hard labor (the maximum sentence for manslaughter as a second-felony habitual offender was eighty years). Following his appeal and conviction on retrial, Mr. Johnson was again sentenced to the maximum sentence for manslaughter, forty years at hard labor. A different trial judge presided over Mr. Johnson's retrial and sentencing, and she gave extensive reasons for imposing the maximum sentence of forty years, which are outlined above. In the same proceeding Mr. Johnson was again adjudicated a second-felony habitual offender, and the trial court vacated the sentence it had imposed earlier and imposed the maximum sentence of eighty years at hard labor for the reasons it had already stated. Mr. Johnson now argues that the imposition of a more onerous sentence after his retrial violated his due process rights by casting a chilling effect on his right to appeal.

Since the trial judge who imposed the present eighty-year sentence on Mr. Johnson was not the same judge who imposed the original fifty-year sentence on him as a second offender, the *Pearce* presumption of vindictiveness does not apply. Nonetheless, the cases cited above still require the record to show the basis for the departure from the original sentence. It is unclear if additional information was adduced at Mr. Johnson's retrial that was not elicited at his first trial because the transcript of that trial is unavailable, and this unavailability was the basis of the reversal of his first manslaughter conviction. For this same reason, the trial court judge who retried Mr. Johnson was unable to know what occurred during the first trial, and could only base Mr. Johnson's sentencing on the information and testimony presented at the second trial.

Under the circumstances presented in this case—a different trial judge imposing a more onerous sentence—the defendant, Mr. Johnson, had the burden of affirmatively proving vindictiveness on the part of the trial judge. We find he failed to satisfy his burden of proof. As the State points out, before imposing the eighty-year sentence the trial court heard the evidence at trial, the evidence at the multiple bill hearing, and the victim impact testimony. The trial court gave detailed reasons for the sentence it imposed, which are outlined above. Although the trial judge did not give any indication as to why she was imposing a more onerous sentence than the prior judge imposed, the record contains no proof of vindictiveness. We thus find this argument unpersuasive.[57]

As previously discussed, a jury found Johnson guilty of manslaughter after his first trial. He was adjudicated a second-felony offender and received an enhanced sentence of 50 years at hard labor.    The appellate court vacated his conviction and sentence on direct appeal, because his right to a meaningful review of the conviction and sentence was violated based on the unavailability of transcripts following Hurricane Katrina.    He was afforded a new trial by jury for manslaughter and was found guilty as charged.    A new judge presided over these proceedings because the original judge had since retired.    After the jury found him guilty of manslaughter, the new trial judge conducted a sentencing hearing and habitual-offender adjudication, citing extensive reasons for imposing an 80-year sentence.

Johnson relies on the presumption of judicial vindictiveness set forth by the United States Supreme Court half a century ago in *North Carolina v. Pearce*, 395 U.S. 711, 725-26, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).    The state appellate court considered that decision and later analogous decisions of the United States Supreme Court in denying relief and concluded

---

[57] *State v. Johnson*, 41 So.3d at 1210-13.

that the presumption of vindictiveness did not apply and no actual vindictiveness was shown in this case.    For the following reasons, the state court's rejection of the claim was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court of the United States.

In *North Carolina v. Pearce*, the United States Supreme Court imposed a general presumption of judicial vindictiveness when a judge imposes a more severe sentence on a defendant after a new trial.    *Id*.    The Court reasoned, "[d]ue process of law... requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial."    *Id*. at 725.    The Court further explained, "since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge."    *Id*.    The Court stated that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear."    *Id*. at 726.    The Court explained:

> Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding.    And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

*Id*.

The circumstances in which the *Pearce* presumption applies have been limited in

subsequent United States Supreme Court decisions.    For instance, in *Chaffin v. Stynchcombe*, the Court declined to apply the presumption when the defendant in a second trial was given a harsher sentence by a different jury – vindictiveness could not be presumed where the second jury had no personal "stake" in the prior conviction.[58]    Notably for present purposes, the Court observed:

> *Pearce* was not written with a view to protecting against the mere possibility that, once the slate is wiped clean and the prosecution begins anew, a fresh sentence may be higher for some valid reason associated with the need for flexibility and discretion in the sentencing process.    The possibility of a higher sentence was recognized and accepted as a legitimate concomitant of the retrial process.[59]

The scope of the presumption has been further narrowed to apply only "where there is a reasonable likelihood that the increase in sentence was the product of *actual* vindictiveness on the part of the sentencing authority." *Plumley v. Austin*, 135 S.Ct. 828, 190 L.Ed.2d 923 (2015) (Thomas, J. dissenting) (citing *Alabama v. Smith*, 490 U.S. 794, 799, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989) (presumption inapplicable where the first sentence was based on a guilty plea and the second sentence follows a trial)).    For example, as Justice Thomas observed in his *Plumley* dissent, the Supreme Court in *Texas v. McCullough*, "refused to apply the presumption to a higher sentence entered after a retrial ordered by the original

---

[58]    412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973).

[59]    *Id.* at 25.

sentencing judge [because] unlike the judge who has been reversed, we explained, the trial judge had no motivation to engage in self-vindication." *Id.* (quoting *Texas v. McCullough*, 475 U.S. 134, 138-139, 106 S.Ct. 976, 89 L.Ed.2d 104 (1986)).    In *McCullough*, the Court emphasized that "[b]eyond doubt, vindictiveness of the sentencing judge is the evil the Court sought to prevent rather than simply enlarged sentences after a new trial."    *McCullough*, 475 U.S. at 138.    The Court clarified that the language in *Pearce* was "not ever intended to describe exhaustively all of the possible circumstances in which a sentence increase could be justified."    *Id.* at 141.

The United States Fifth Circuit Court of Appeals had occasion to review Supreme Court law on the judicial-vindictiveness presumption in a case where a greater sentence was imposed on a defendant by a different judge on remand for resentencing following a successful appeal for breach of a plea agreement.    *United States v. Rodriguez*, 602 F.3d 346 (5th Cir. 2010).    In *Rodriguez*, the Fifth Circuit held the presumption did not apply at resentencing and no actual vindictiveness was shown.    In reviewing relevant Supreme Court case law, the Fifth Circuit noted that the Supreme Court previously declined to apply the presumption of vindictiveness in the context of Kentucky's two-tier criminal court system where a defendant could elect and obtain a trial *de novo* in the court of general jurisdiction after conviction in an inferior court of limited jurisdiction, resulting in a greater fine.    *Id.* at 353 (citing *Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 36 L.Ed.2d 584 (1972)).    The Supreme Court observed that it was a *different court*— "not the court with

whose work [defendant] was sufficiently dissatisfied to seek a different result on appeal; and... not the court that is asked to do over what it thought it had already done correctly." *Colten v. Kentucky*, 407 U.S. 104, 116-17, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972).    The Court further noted "[t]he trial de novo represents a completely fresh determination of guilt or innocence."    *Id.* at 117.    The Fifth Circuit went on to observe that after *Colten*, the presumption's reach was further limited by *Chaffin v. Stynchcombe* (discussed *supra*), and summarized that Court's analysis as follows:

> The Court held sentencing by a jury does not carry such a threat of vindictiveness. It reasoned a jury would not (should not) know of the prior sentence; would have no institutional interest in discouraging meritless appeals; and was not the same judicial authority whose handling of the prior trial was sufficiently unacceptable to have required a reversal of the conviction. Thus, the jury, unlike the judge who has been reversed, will have no personal stake in the prior conviction and no motivation to engage in self-vindication.

*Rodriquez*, 602 F.3d at 354 (citing *Chaffin*, 412 U.S. at 27).

The unique question presented in Johnson's case is whether the *Pearce* presumption applies when a defendant receives a new trial upon direct appeal (made impossible due to missing transcripts) and is convicted by a new jury and sentenced by a new judge to a more severe sentence.    This uniqueness stems primarily from the fact that, while Johnson noted his intention to appeal his original 50-year sentence immediately following imposition of that sentence, that appeal was rendered effectively impossible by the destruction of the trial transcripts in the floodwaters of Hurricane Katrina.    This is not a case where a defendant "successfully" appealed a conviction, gaining a new trial in the process.    Rather, Johnson

simply could not receive meaningful direct review due to Hurricane Katrina's destruction of the necessary materials to create a record for appeal, thus necessitating a new trial.

The Court sought additional briefing on the implications of these unique circumstances vis-à-vis the vindictiveness analysis[60]  and conducted its own research in an attempt to locate any authority to support the notion that the *Pearce* presumption should apply in these circumstances.     It could locate no such authority.

Johnson, through counsel, argues in his supplemental brief:

> [i]t is odd to note, that had the record been able to be produced, more likely than not, Mr. Johnson's conviction and sentence would have been affirmed and he would have remained sentenced to "only" fifty years.[61]

Candidly, the undersigned cannot disagree with this assessment or fault Johnson or his counsel for their stridency in arguing against what clearly appears to them to be an anomalous and unjust result.     Unfortunately for Johnson, however, the Court cannot act on such assumptions under the constraints of the AEDPA.     Indeed, it is the State's position on this issue that is aligned with *Pearce* and its progeny and the strict AEDPA deference this Court is bound to afford the state courts' decisions.

The Louisiana Fourth Circuit Court of Appeal held that under these circumstances, the *Pearce* presumption of vindictiveness did not apply.     Johnson points to no Supreme

---

[60]     Rec. doc. 41.

[61]     Rec. doc. 43 at p.3.

Court case, and as noted the Court has found none, that directly holds that the *Pearce* presumption applies in this situation.    Not only is there no Supreme Court precedent governing this unique case, the relevant case law cited above strongly suggests that the presumption would not apply under these circumstances and Johnson points to no controlling law that holds the presumption applies when the new judge does not explain the increase in sentence on the record and the reasons given for the sentence imply no vindictive basis for the harsher sentence imposed.    *Bryant v. Secretary, Dept. of Corrections*, No. 08-CV-442, 2012 WL 1071899 at *1 (N.D. Fla. Mar. 28, 2012) (citing conflicting law from the various circuits regarding the level of explanation required, if any, for the increase in sentence when considering applicability of the presumption of vindictiveness).    A petitioner is only entitled to relief when a state-court decision is contrary to, or involves an unreasonable application of, clearly established federal law, which is simply not the case here.    *See Carey v. Musladin*, 549 U.S. 70, 76-77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006).

When the presumption does not apply, the defendant must affirmatively prove actual vindictiveness.    *Wasman v. United States*, 468 U.S. 559, 569, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984).    On this issue and as noted earlier, the Court ordered additional briefing by the parties.[62]    Two questions the Court wanted addressed were:

> (1) Where the Pearce presumption does not apply, is a sentencing judge different than the original sentencing judge required by Supreme Court or Fifth Circuit precedent to articulate reasons for imposing a harsher sentence than the original judge?

---

[62]    Rec. doc. 41.

(2) Does any such requirement apply to sentencing enhancements imposed as a result of an habitual-offender finding?

(<em>Id.</em>).

Responding to these questions, counsel for Johnson made the argument – without citation to any authority – that where the <em>Pearce</em> presumption does not apply, "clearly established law for a citizen who went to trial before a jury and was sentenced by the judge who presided over that trial, required that the sentencing judge articulate reasons for imposing a harsher sentence than the original judge."[63]    The Court's order calling for this supplemental briefing was clear and precise – it sought <u>citation</u> to "Supreme Court or Fifth Circuit precedent" that stands for this proposition, not just counsel's argument.    No such citation was provided and, having thoroughly researched the question, the Court can locate no binding precedent requiring a sentencing judge different than the original sentencing judge to articulate reasons for imposing a harsher sentence than the original judge.[64]

Counsel for Johnson made another comment in his supplemental brief that caused the Court some concern regarding the "actual vindictiveness" question.    For the second time in brief, counsel suggested that the second trial judge had affirmatively made a statement to the effect that she was sentencing Johnson as if he were convicted of second-degree murder because, in her view, the evidence would have supported such a conviction.[65]    The Court

---

[63]    Rec. doc. 43.

[64]    In this unusual case, it likely would have been impossible for the second judge to accomplish such a task in any event, as the entire transcript of the first trial was missing.

[65]    In Johnson's original Petition, counsel stated "[d]uring Mr. Johnson's sentencing,

closely reviewed the record to locate such a statement and found nothing.     Nonetheless, concerned that counsel was aware that such a statement had been made by the second trial judge and supposing that if such a statement had been made it might at least serve as <u>some</u> evidence of actual vindictiveness, the Court gave counsel yet another opportunity to locate the statement in the record and submit another supplemental brief informing the Court where the statement might be found.[66]

Counsel thereafter did review the record and filed another supplemental brief.[67]     In that brief, counsel was unable to cite any portion of the record that supported the idea that the trial judge had made the statements counsel had attributed to her.     In what the Court surmises was counsel's attempt to explain his inability to locate the statement in the record, counsel explained in a footnote:     "Counsel states that due to his having worked before the judge in this matter since the day that judge took the bench, his description of how the original sentence suddenly became an eighty (80) year sentence, employed a bit of

---

the judge clearly and purposefully declared her intent to circumvent the jury's Manslaughter [conviction] by giving Mr. Johnson the functional equivalent of the sentence for Second Degree Murder.     <u>The trial court judge stated as much.</u>"     (Rec. doc. 1 at pp. 13-14 (emphasis added).     In his supplemental brief, counsel wrote "But, a judge cannot take the position that in my opinion you committed a second degree murder and therefore, I impose a sentence designed to be the equivalent of a sentence of Natural Life, upon a manslaughter conviction."     (Rec. doc. 43 at p. 2).

[66]     Rec. doc. 45.

[67]     Rec. doc. 48.

psychological license." [68]    It should go without saying in this habeas proceeding that counsel's resort to "psychological license" will not be sufficient to carry Johnson's burden of demonstrating actual vindictiveness.

As detailed above, the record in this case contains entirely independent, non-vindictive reasons for the sentence imposed by the new judge, who had no connection to the original trial judge or access to any previous transcripts from the original proceedings. Furthermore, unlike convictions and sentences overturned on appeal that return to the same trial judge for further review, the second trial judge here had no personal stake in Johnson's prior conviction and sentence that was vacated simply because the pertinent transcripts were unavailable.    This further lessens the possibility that actual vindictiveness played a role in the harsher sentence.

On its face, the sentencing result in this case can certainly be viewed as overly harsh, or even unfair.    Even if the Court took that view, it is constrained by the law to recommend rejection of Johnson's vindictiveness claim.    With regard to that claim, the text of the AEDPA is clear:    "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim. . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . .

---

[68]    *Id.*

."    28 U.S.C. § 2254(d).    This provision "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."    *Harrington v. Richter*, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment)).

Johnson's claim of vindictiveness was clearly adjudicated on the merits in state-court proceedings and there is simply no clearly established federal law that either requires the application of the *Pearce* presumption or requires the second trial-court judge to articulate reasons for imposing a harsher sentence than the original judge.    And, as the Court of Appeal concluded, the record contains no proof of actual vindictiveness.    The state court's rejection of this claim was reasonable.    Johnson is not entitled to relief on this claim.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that Johnson's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United*

*Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[69]

New Orleans, Louisiana, this  __9th__  day of  __September__ , 2019.

_____

**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[69]  *Douglass* referenced the previously applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.